J-A27039-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ARTHUR LEE GRIFFIN, JR. | : | |
| | : | |
| Appellant | : | No. 1620 MDA 2021 |

Appeal from the Judgment of Sentence Entered July 1, 2021
In the Court of Common Pleas of Huntingdon County Criminal Division at
No(s): CP-31-CR-0000264-2019

BEFORE: DUBOW, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.: **FILED: JANUARY 26, 2023**

Appellant, Arthur Lee Griffin, Jr., appeals from the judgments of sentence imposed after a jury found him guilty of possession of a controlled substance with intent to deliver (PWID), conspiracy to commit possession of a controlled substance with intent to deliver, dealing in proceeds of unlawful activities, corrupt organizations – conducting or participating in a pattern of racketeering activity, corrupt organizations – conspiracy with others to conduct or participate in a pattern of racketeering activity, and criminal use of a communication facility.[1] He challenges the adequacy of his waiver of his

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(30), 18 Pa.C.S. § 903, 18 Pa.C.S. § 5111(a)(1), 18 Pa.C.S. § 911(b)(3), 18 Pa.C.S. § 911(b)(4), and 18 Pa.C.S. § 7512(a), respectively.

*(Footnote Continued Next Page)*

right to counsel, the denial of his claim alleging a constitutional violation of his right to a speedy trial, the legality and discretionary aspects of his sentence, and the weight and sufficiency of the evidence. Upon careful review, we vacate the judgments of sentence and remand for a new trial.

The trial court offers the following summary of the facts in this case:

> From approximately December of 2016 through January of 2018[, Appellant] was the head of a drug trafficking enterprise that originated in Pittsburgh and targeted Huntingdon County as its marketplace. The enterprise purchased heroin (including fentanyl sold as heroin), crack cocaine, and cocaine powder from unknown suppliers in Pittsburgh. The drugs were then transported to Huntingdon County and either sold directly or further processed and packaged for sale. The principal members of the enterprise were [Appellant], his then-girlfriend (now wife) Shantel Johnson, and [Appellant's] friend Jemiere Hickman. [Appellant] was the head of the enterprise, with Shantel as his second-in-command.
>
> The enterprise began just with [Appellant] and Shantel. The pair made contact with [the] local drug community in and around the borough of Mount Union in Huntingdon County. Moving quickly, the two established themselves as having a steady supply of product. They started by selling directly to users and small-time dealers (who were often addicts themselves), then expanded to having others deal for them. This was typically done under an arrangement whereby the dealers would be "fronted" drugs, meaning payment was due once the drugs had been sold or used. "Fronting" drugs allowed [Appellant] and Shantel to trap the dealers in a cycle of debt, as they always needed to sell more drugs to pay off what they owed and to feed their habit. It also meant the dealers were always trying to expand their sales, to [Appellant]'s benefit.

---

We note that Appellant identified the order denying his post-sentence motion as the order he wished to appeal in his notice of appeal. However, "[i]n a criminal action, appeal properly lies from the judgment of sentence made final by the denial of post-sentence motions." *See Commonwealth v. Shamberger*, 788 A.2d 408, 410 n.2 (Pa. Super. 2001) (*en banc*), *appeal denied*, 800 A.2d 932 (Pa. 2002). We have corrected the caption accordingly.

From the very beginning, [Appellant] and Shantel took steps to avoid detection. [Appellant] was usually known as "Mack," and Shantel was usually known as "China," though sometimes "Miss T" or "Tell." The two also went by "Romeo" and "Juliet." Instead of getting an apartment, they began by staying at the homes of drug dealers and users they had met. They would also stay in hotels around Huntingdon Borough. The pair rarely stayed in one place for more than a night or two, and they would often split up. They broke up their time in Huntingdon County with trips back to Pittsburgh to obtain more drugs, or "re-up."

The enterprise grew large enough that [Appellant] and Shantel needed help running it. In the March/April 2017 timeframe they recruited Jemiere Hickman to join them. Hickman and [Appellant] had gotten to know each other when they were both incarcerated at SCI-Forest, and [Appellant] got in touch with Hickman after he was released in February 2017. Hickman, who went by "Head" or "Head Shot," effectively became middle management for the enterprise.

Instead of conducting drug transactions himself, [Appellant] would make the necessary arrangements via cell phone, using calls and text messages, and then have Shantel or Hickman conduct the meet and make the exchange of drugs and money. Hickman personally supervised the operations of the local dealers, making sure they did not use the entirety of the supply they had been given before selling it, and making sure that their money was right.

In time, [Appellant] stopped coming to Huntingdon County entirely. He shifted to staying in hotels outside of Huntingdon County (such as in Altoona) and having users and dealers come out to meet him or Shantel at a public location such as a large store or gas station. He then began staying in the Pittsburgh area exclusively, having some of the Huntingdon County dealers come out to meet him or Shantel when it was time to re-up. For the significant number of deals that still occurred in Huntingdon County, [Appellant] limited himself to coordinating and approving deals via phone calls and text messages. Shantel became the regular point of contact for those customers who had previously dealt with [Appellant] directly, making trips to the Huntingdon County area to make sales and collect payments on a regular

basis. The pattern continued, with the enterprise's sales continuing to expand, until late September/early October 2017.

The first location [Appellant] and Shantel had worked from was the residence of Jesse Hamman in the Valley View Mobile Home Park in Shirley Township, Huntingdon County. Unbeknownst to [Appellant] and Shantel, the start of their enterprise coincided with the start of an investigation by Pennsylvania State Police Trooper Andrew Corl into drug activity at that location (Hamman was a well-known local dealer who had already drawn attention to himself). As [Appellant] and Shantel began expanding their activities, Trooper Corl began getting surveillance pictures of them via a remote camera located across the street from Hamman's mobile home. He was able to conduct a controlled buy from [Appellant] in April 2017 using a confidential informant (a "CI"). Trooper Corl was also able to coordinate a traffic stop of Shantel and [Appellant] in May 2017 in an attempt to learn their true identities. The trooper who made the stop was able to positively identify Shantel, but was thwarted by [Appellant]. [Appellant] provided the trooper with the name, birth date, and social security number of Pierre Trent, [Appellant]'s brother. [Appellant]'s physical characteristics (height, weight, age, etc.) were close enough to Trent's that the trooper believed the information was accurate, and the investigation proceeded under the assumption that Trent, not [Appellant], was "Mack."

In late September 2017[,] a search warrant was executed at the apartment of Ashley Shade and her boyfriend, Shane Hollibaugh. Ashley and Shane had been dealing heroin for [Appellant], and had been making regular trips to Pittsburgh over the summer to re-up, bringing back large quantities each time. The search warrant provided a key piece of evidence for Trooper Corl, in the form of a written log (an "owe sheet") that Ashley had kept showing Shane's drug activity with [Appellant] for that month (i.e., how much, in term of dollar value, [Appellant] had fronted to Shane, and how much Shane still owed [Appellant], including transaction dates). The owe sheet also revealed something that Trooper Corl had not yet known – [Appellant]'s enterprise was not the only one operating in Huntingdon County at that time. Not only had Ashley and Shane been dealing heroin for [Appellant], but they had also been dealing crack and heroin for Marcus Womack, an individual with ties to the Philadelphia area. A second search warrant was executed in early October 2017 at a location dealing with heroin and crack. The evidence from both search

warrants was significant, and included cell phones from which PSP forensic technicians were able to recover text messages and call data.

The arrests of Ashley, Shane, and others made a large dent in the enterprise's sales. However, it continued to be active, with Hickman running the local operations, Shantel acting as the go-between, and [Appellant] continuing to run the show and coordinate deals from Pittsburgh. The event that really put a damper on the enterprise's activities was [Appellant]'s arrest in Pittsburgh on January 24, 2018. [Appellant] was a parole absconder, having been released early on parole on June 20, 2016, from a sentence of 5-10 years' incarceration on a conviction for Possession of a Firearm by a Person Prohibited, 18 Pa. C.S. § 6105(a)(1), and then fled from a halfway house in August 2016. See CP-02-CR-0005095-2008. His arrest in Pittsburgh arose from the resulting warrant.

In the meantime, the investigation into [Appellant]'s enterprise began to heat up. Up until October 2017 it had been overseen by Huntingdon County District Attorney David Smith. With the knowledge that not one, but two, drug trafficking enterprises had been operating in Huntingdon County, DA Smith reached out to the Office of the Attorney General for assistance via the Commonwealth Attorneys Act, 71 P.S. §§ 732-101, *et seq.* Deputy Attorney General David C. Gorman was assigned to the matter and took the lead on it. Armed with the evidence from the search warrants and recently arrested witnesses who provided information and testimony (including Ashley and Shane), DAG Gorman sought and obtained time before the Forty-Second Statewide Investigating Grand Jury. The presentation of testimony and evidence began in winter 2018 and extended into the following fall. [Appellant]'s enterprise became known as the "Pittsburgh organization," and Womack's enterprise because known as the "Philadelphia organization."

On October 23, 2018, the Forty-Second Statewide Investigating Grand Jury returned Presentment No. 7, outlining the full scope of its findings regarding the Pittsburgh and Philadelphia organizations. The criminal complaints resulting from the presentment lead to the arrest of thirty-two individuals who had been involved in the organizations' activities, including Shantel, Hickman, and many of the witnesses who testified at [Appellant]'s trial. However, there was a significant issue. The witnesses who

testified before the grand jury knew [Appellant] only as "Mack" or "Romeo"; Trooper Corl had been able to positively identify Shantel, but since [Appellant] had provided his brother's name to the trooper during the May 2017 traffic stop, the presentment identified Pierre Trent as being the head of the Pittsburgh organization, rather than [Appellant]. A criminal complaint was filed against Trent, and he was arrested in the Pittsburgh area in late October 2018, around the same time as Shantel, Hickman, and other defendants in the case. Soon after arrest Trent was transported to the Huntingdon County Prison, and he immediately began telling officers that they had the wrong person. This was relayed to Trooper Corl, who went to the prison and, immediately upon seeing Trent, recognized that Trent was not the individual he had surveilled in Huntingdon County and known as "Mack." Trooper Corl interviewed Trent, and Trent relayed to Trooper Corl that his brother, [Appellant], had given Trent's name to police on a number of occasions, resulting in charges being filed against Trent and Trent having to go to court to address them. Trooper Corl investigated further to confirm that Trent had no involvement in the enterprise, and all charges against Trent were withdrawn a few days later. Now in possession of [Appellant]'s real name, Trooper Corl went back through the evidence, making more significant connections between [Appellant] and certain events (such as payments for crack that had been made to [Appellant]'s personal PayPal account by one of his customers, Miranda Crouse). He also listened to hundreds of hours of recorded telephone conversations between [Appellant], Shantel, Hickman, and others that had been made while they were incarcerated, which corroborated the grand jury testimony and revealed additional crimes.

Trial Court Opinion, 2/28/22, 1-6 (footnote omitted).[2]

Appellant was charged with the above-referenced charges and additional counts of possession of a controlled substance with intent to deliver based on the grand jury presentment. Criminal Complaint, Affidavit of

---

[2] The trial court's summary interchangeably referred to Ms. Shade as Ashely Shade and Ashley Shade. We have changed all the references to her as "Ashley," consistent with the identification of that witness's name in the trial notes of testimony.

Probable Cause, 2/5/19. The charges were approved for trial after two preliminary hearings were held before and after the appointment of counsel.[3] Relevant to the issues on appeal, Appellant filed, *inter alia*, a motion to dismiss pursuant to Pa.R.Crim.P. 600(A)(2)(a) that was denied following a hearing on January 22, 2021. Order Denying Rule 600 Motion, 1/25/21; Rule 600 Motion, 12/30/20.

Appellant proceeded to be tried before a jury on March 15-17, 2021. Prior to the selection of the jury, the court addressed a pending request from Appellant to proceed *pro se*. N.T. 3/11/21, 1-4. After the court conducted a colloquy that is the focus of one of the claims presented in this appeal, the court granted the request. *Id.* at 4-20. The court also granted the Commonwealth's pre-trial request to withdraw two counts of possession of a controlled substance with intent to deliver and amend the remaining counts in the bill of information to include an end date for the offenses of January 24, 2018. *Id.* at 14-15, 23.

During the ensuing trial, the Commonwealth presented the testimony of seventeen witnesses, including Trooper Andrew Corl, Ashley Shade, Appellant's brother, Pierre Trent, and Miranda Crouse, who were referenced

---

[3] An attorney at the first preliminary hearing admitted to the court that he was unable to represent Appellant due to a conflict of interest. N.T. 4/24/19, 3. The difficulty with appointing counsel for Appellant resulted from the number of prosecutions occurring simultaneously that arose from the same investigation. *Id.* at 4 (Conflicted counsel: "They are searching high and wide to try to find an attorney who has no conflict in this case whatsoever to represent [Appellant]. I know they are having a very difficult time.").

above in the trial court's factual summary.[4]  Appellant testified and presented the testimony of his brother and his mother.  After hearing all the evidence, the jury found Appellant guilty of the above-referenced charges.  N.T. 3/17/21, 180-81.[5]

On July 1, 2021, the trial court sentenced Appellant to an aggregate sentence of 19 years and three months to 38 years and six months'

_____

[4] The other witnesses included: the other trooper that conducted surveillance of the controlled drug sale in April 2017 (Trooper Steven Peterson); the police informant who conducted the controlled drug sale (Chelsea Hess); the forensic scientist who examined the drugs recovered from the controlled drug sale (Gabriel Llinase); a trooper who responded to a car accident involving Ashley Shade and Shane Hollibaugh which resulted in the recovery of drugs from Ms. Shade's purse (Trooper Martie Johns); a person who accompanied Ashley Shade for a drug purchase conducted by Appellant's wife and was arrested after dealing drugs with Ms. Shade (Sierra Everetts); a crack cocaine user who obtained crack cocaine from Jemiere Hickman and to whom Mr. Hickman introduced Appellant and his wife as drug sellers (Monisha Hunter); a regular purchaser of heroin bundles from Appellant (Richard Hollibaugh; no relation to Shane Hollibaugh, N.T. 3/16/21, 20); a man who let Appellant and his wife stay with him for money and "some crack" and saw them with supplies of heroin and crack cocaine in his home (Jesse Acevado); a purchaser of crack cocaine and heroin from Jesse Hamman's residence (Jennifer Lantz); a police confidential informant whose daughter was supplied heroin by Jesse Hamman and who purchased crack cocaine from Appellant and his wife (Kevin Banks); a trooper who reviewed and extracted information from three cellphones that were recovered in this case (Trooper Todd Roby); a trooper who conducted the traffic stop of Appellant in May of 2017 (Corporal Addison Lovett); and a police officer who conducted a traffic stop of Appellant and his wife in October of 2017 and later identified Appellant to Trooper Corl (Officer Frank Balisteri).

[5] Prior to sentencing, present counsel entered his appearance on Appellant's behalf.  Praecipe for Entry of Appearance, 4/27/21.

imprisonment.[6]   N.T. 7/1/21, 15-16; Sentencing Order, 7/1/21, 1-2.   The

court subsequently denied timely-filed post-sentence motions advancing the

---

[6] The aggregate term included including consecutive imprisonment terms of 60 to 120 months for possession of a controlled substance with intent to deliver and conspiracy to commit possession of a controlled substance with intent to deliver, 33 to 66 months for dealing in proceeds of unlawful activities, corrupt organizations – conducting or participating in a pattern of racketeering activity, and corrupt organizations – conspiracy with others to conduct or participate in a pattern of racketeering activity, and 12 to 24 months for criminal use of a communication facility.

Appellant had a prior record score of five.  N.T. 7/1/21, 9.  The parties contested the offense gravity scores for possession of a controlled substance with intent to deliver and conspiracy to commit possession of a controlled substance with intent to deliver, and the court accepted Appellant's argument that the offense gravity scores for those offenses should be six.  N.T. 7/1/21, 1-5, 7, 11-12; N.T. 6/3/21, 1-2; **see also** 204 Pa. Code § 303.3(c)(3) (conspiracy to commit an offense under the Controlled Substance, Drug, Device and Cosmetic Act (35 P.S. §780-101, *et seq.*) received the same offense gravity score of the offense that was the object of the conspiracy); 204 Pa. Code § 303.15 (offense listing; 7th ed. amend. 4) (setting an offense gravity score of six for possession with intent to deliver less than one gram of other narcotics, Schedule I & II).  For the remaining offenses, the Sentencing Guidelines set offense gravity scores for the remaining offenses of eight for dealing in proceeds of unlawful activities, corrupt organizations – conducting or participating in a pattern of racketeering activity, corrupt organizations – conspiracy with others to conduct or participate in a pattern of racketeering activity, and five for criminal use of a communication facility.  204 Pa. Code § 303.15 (offense listing; 7th ed. amend. 4).

Based on the addressed offense gravity scores and the prior record score, the Sentencing Guidelines recommended minimum imprisonment terms of: 21 to 27 months, plus or minus nine months for aggravating or mitigating factors, for possession of a controlled substance with intent deliver and the related conspiracy count; 27 to 33 months, plus or minus nine months for aggravating or mitigating circumstances, for dealing in proceeds of unlawful activities, corrupt organizations – conducting or participating in a pattern of racketeering activity, and corrupt organizations – conspiracy with others to conduct or participate in a pattern of racketeering activity; and 12 to 18 months, plus or
*(Footnote Continued Next Page)*

claims that Appellant raises in this appeal. Order Denying Post-Sentence Motions, 10/10/21; Supplemental Post-Sentence Motions, 8/27/21; Order Granting Leave to File Supplemental Post-Sentence Motions, 7/13/21; Post-Sentence Motions, 7/13/21. Appellant timely filed a notice of appeal and a court-ordered concise statement of errors complained of on appeal. Rule 1925(b) Statement, 1/10/22; Rule 1925 Order, 12/21/21; Notice of Appeal, 12/10/21.

Appellant presents the following questions for our review:

1. Was it error to deny the [Appellant's] Motion for [a] New Trial based upon an invalid waiver of counsel, ([1]) when the trial court noted on the record that it "was not satisfied you understand the charges against you" but did not thereafter take any action to inform the [Appellant] of the nature and/or elements of the charges, and (2) when the [Appellant] could not recite the maximum sentence he was facing, and the trial court did not ensure that he was accurately informed of the same, both in violation of Pa.R.Crim.P. 121?

2. Was it error to deny the [Appellant's] Motion for Arrest of Judgment on the grounds that the Covid-19 related delay in his trial constituted a violation of his constitutional right to a speedy trial?

---

minus 3 months for aggravating or mitigating circumstances, for criminal use of a communication facility. 204 Pa. Code § 303.16(a) (basic sentencing matrix; 7th ed. amend. 4); **see also** N.T. 7/1/21, 12. Accordingly, the court imposed terms above those recommended by the guidelines for possession of a controlled substance with intent to deliver, conspiracy to commit possession of a controlled substance with intent to deliver, and criminal use of a communication facility, and imposed standard guideline-range sentences for the two corrupt organizations counts.

3.      Was it error to deny the [Appellant's] Motion for Arrest of Judgment on the grounds that he was convicted of two conspiracies relating to the same underlying crime, in Counts 4 and 7?

4.      Was it error to deny the [Appellant's] Motion to Modify Sentence on the grounds that the trial court's departure from the guidelines on Counts 1 and 4 was an abuse of discretion when considered in light of the Court's factual findings that the [Appellant's] conduct had affected hundreds of people, yet the proven conduct for sentencing on those specific counts was the possession with intent and conspiracy relating thereto of less than one gram of controlled substances?

5.      Was it error to deny the [Appellant's] Motion for [a] New Trial based on the weight of the evidence?

6.      Was it error to deny the [Appellant's] Motion for Judgment of Acquittal based on insufficient evidence of actual or constructive possession, or a pattern of racketeering activity?

Appellant's Brief at 3-5.

In his first claim, Appellant asserts that the trial court conducted an inadequate waiver of counsel colloquy by failing to confirm his understanding of the nature and elements of his charges and the permissible ranges of the sentences and fines for the charges. Appellant's Brief at 13-19. The Commonwealth informs us that it is constrained to agree that this claim is meritorious because it concludes that the colloquy was deficient and thus

Appellant did not lawfully waive his right to counsel before trial.[7] Commonwealth Correspondence to Superior Court, 7/18/22, 1.

The trial court recommends that we reject this claim as meritless. It advises us that Appellant offered a "clear and cogent description" for one of the corrupt organizations charges and, while it admits that Appellant struggled to describe the nature of the dealing in proceeds of unlawful activities charge, the court suggests that "his struggle was not with understanding the elements of the offense, but putting it into proper words." Trial Court Opinion, 2/28/22, 37, 46. As for the notice requirements for the sentencing and fines exposure, the court directs us to note that Appellant was told that a similarly situated defendant had been sentenced to a maximum term of ninety years' imprisonment. *Id.* at 40, 44-45. The court recommends that we should appreciate the fact that Appellant conducted research for his case and took copious notes in order to conclude that Appellant understood the necessary elements for waiving counsel, and eschew finding that the court erred by not reviewing all the offenses with Appellant. *Id.* at 45 ("[T]he question becomes whether the Court's reliance on [Appellant's] repeated representations that he had conducted research, taken copious notes, and understood the charges against him is somehow negated by the fact that the Court did not provide [Appellant] with a point-by-point recitation and review of each count.

---

[7] Here, as at trial, the Commonwealth is represented by the Attorney General's office. The Commonwealth informed this Court of its concession to relief in correspondence filed in lieu of a brief. Commonwealth Correspondence to Superior Court, 7/18/22.

Respectfully the Court asserts that the question should be answered in the negative."), 49 ("To have presented [Appellant] with a point-by-point soliloquy on the intricacies of the statutes under which he was charged would have been to undertake a formalistic process designed not to benefit [Appellant], but to winnow yet further the issues on which he might appeal."). Upon our careful review, we are constrained to reject the points raised by the court and agree with the mutual stance of the parties that Appellant participated in an inadequate waiver of counsel colloquy.

"When a defendant seeks to waive the right to counsel, the trial court must conduct on the record a full and complete waiver colloquy to determine whether the defendant's waiver is knowing, voluntary, and intelligent." *Commonwealth v. Floyd*, 257 A.3d 13, 17-18 (Pa. Super. 2020); *see also* Pa.R.Crim.P. 121(C) ("When the defendant seeks to waive the right to counsel after the preliminary hearing, the judge shall ascertain from the defendant, on the record, whether this is a knowing, voluntary, and intelligent waiver of counsel."). The court is required to elicit information from the defendant that he or she, among other things, "understands the nature of the charges against [them] and the elements of each of those charges" and "is aware of the permissible range of sentences and/or fines for the offenses charged." Pa.R.Crim.P. 121(A)(2)(b)-(c). "A [trial] court's failure to conduct a valid colloquy before allowing a defendant to proceed *pro se* constitutes reversible error." *Commonwealth v. Forrester-Westad*, 282 A.3d 811, 817 (Pa. Super. 2022), **quoting Floyd**, *257 A.3d at 18.*

With respect to the duty to ensure Appellant's understanding of the nature and elements of the charges, the record does not reflect that the court reviewed the nature and elements of the offenses with Appellant. The court asked Appellant to explain the charges for corrupt organizations and dealing in proceeds of unlawful activities. N.T. 3/11/21, 5-6. With respect to the racketeering charge under the corrupt organizations statute, Appellant responded, "In the charge of corrupt organization, it's basically a -- as is it's alleging I and another group of people or whatever orchestrated an organized -- some type of illicit dealings." *Id.* at 5. With respect to dealing in proceeds of unlawful activities, Appellant responded, "That charge -- basically like I took funds and I don't know how to word it correct." *Id.* at 6. The court acknowledged that the charges were complicated, but Appellant tried to reassure the court that he could defend himself by reading his notes which he did not possess at the time of the colloquy. *Id.* at 6-7. The court later told Appellant during the colloquy, "I'm not satisfied you understand the charges against you but we're going to go over the charges and I want you to explain [them] to me." *Id.* at 12. Appellant tried to reassure the court that he had "a pretty good idea what all the charges mean and what they represent," *id.*, but the court never thereafter went over the charges with him on the record as it stated it would.

The trial court's limited questioning of Appellant as to his understanding of the nature and elements of the charges was inadequate. The court did not appreciate that it had a duty to review all the charges and their elements with

- 14 -

Appellant.  *See Commonwealth v. Clyburn*, 42 A.3d 296, 299 (Pa. Super. 2012) ("It is incumbent on the court to fully advise the accused [of the nature and elements of the crime] before accepting waiver of counsel.") (internal quotation marks omitted); *citing Commonwealth ex rel. Clinger v. Russell*, 213 A.2d 100, 102 (Pa. Super. 1965) (brackets added in *Clyburn*). In *Clyburn*, we remanded for a new trial on theft charges where a court directed a defendant to sign a written waiver of counsel colloquy form that did not specify the charges and the elements of each of those charges and where the court directed the prosecutor to explain the nature of the charges to the defendant but while the prosecutor listed the crimes charged, the prosecutor did not specify the nature and elements of those charges.  42 A.3d at 301-02. Here, as in *Clyburn*, we are constrained to agree that a waiver of counsel colloquy was inadequate because the lower court did not ensure that the elements of the pending charges were ever explained as part of the colloquy being reviewed.

By suggesting to this Court that we should find the waiver of counsel colloquy adequate based on Appellant's efforts to prepare for self-representation, the trial court is advising us to review Appellant's awareness of the essential elements for a valid waiver of counsel colloquy under the totality of the circumstances.  We are respectfully unable to take that approach because of controlling precedent.  *See Commonwealth v. Phillips*, 93 A.3d 847, 853-54 (Pa. Super. 2014) ("When reviewing a trial court's basic compliance with the requirements of Rule 121, we do not first apply a 'totality

- 15 -

of the circumstances' test … In this context we look at the totality of the relevant circumstances only after we decide the trial court has met the minimum requirements of Rule 121…") (citations omitted); ***Commonwealth v. Payson***, 723 A.2d 695, 704 (Pa. Super. 1999) ("Although the validity of a guilty plea colloquy is to be viewed under the totality of the circumstances, we may not apply a totality analysis to a waiver of counsel colloquy."); ***see also id.*** (noting with respect to waiver of counsel colloquies, "[A]ny shortcoming relative to this colloquy cannot be gauged to the quality of an accused's self-representation nor justified on the basis of his prior experience with the system") (citations omitted).

We also discern that the trial court's colloquy failed to ensure Appellant's awareness of the permissible ranges of sentences and fines which, in the alternative, would have rendered the colloquy inadequate. Appellant informed the court that he understood the permissible range of sentences that could be imposed, but when the court asked him what they were, Appellant was unable to recite them. N.T. 3/11/21, 14. Instead, he responded, "Depends based off the charge. I'm not here to say that I'm an expert in law.…" ***Id.*** at 14. The court then asked the Commonwealth for a list of the charges and the range of sentencing. ***Id.*** In an ensuring discussion of the Commonwealth's request to amend the charges to remove additional counts of possession of a controlled substance with intent to deliver, the Commonwealth addressed what it anticipated were the applicable ranges recommended by the Sentencing Guidelines but did not address any maximum sentences permitted

for each of the pending charges. *Id.* at 15-16. When asked for the applicable "maximums," the Commonwealth responded, "If what you mean what the maximum part of it would be, it would be 10 to over 80 years." *Id.* at 16. The Commonwealth subsequently referenced the fact that Marcus Womack, who was a similarly situated defendant, ultimately received a prison sentence of 39 to 90 years. *Id.* at 17.

This discussion concerning sentencing failed to accurately note the applicable sentencing ranges in any fashion and thus also failed to ensure Appellant's understanding of his sentencing exposure at the time of his waiver of counsel. Normally, the possession of Schedule I or II controlled substances in violation of 35 P.S. § 113(a)(30) would result in an applicable maximum possible prison term of fifteen years' imprisonment. *See* 35 P.S. § 113(f)(1). Because Appellant had prior convictions for violations of 35 P.S. § 113(a)(30), the maximum permissible sentence for that crime would be thirty years' imprisonment. *See* 35 P.S. § 780-115(a). The maximum permissible sentence for the conspiracy charge involving possession of a controlled substance with intent to deliver was fifteen years. *See* 18 Pa.C.S. § 905 (conspiracy is of the same grade and degree as the most serious offense that is the object of the conspiracy); *see also Commonwealth v. Hoke*, 962 A.2d 664, 668 (Pa. Super. 2009) (*en banc*) ("inchoate crimes have the same *maximum* sentences as the underlying crimes to which they relate) (emphasis in original); *Commonwealth v. Young*, 922 A.2d 913, 918 (Pa. Super. 2007) (the sentencing enhancement under 35 P.S. § 780-115 does not apply to

conspiracy). The remaining applicable maximum sentences for the remaining offenses are twenty years each for dealing in proceeds of unlawful activities and the two counts under the corrupt organizations statute, and seven years for criminal use of a communication facility. *See* 18 Pa.C.S. § 911(c) (grading corrupt organization convictions under 18 Pa.C.S. § 911(b) as felonies of the first degree); 18 Pa.C.S. § 1103(1) (setting a maximum sentence for felonies of the first degree at twenty years); 18 Pa.C.S. § 5111(c) (setting maximum sentence for dealing in proceeds of unlawful activities); 18 Pa.C.S. § 7512(b) (setting a seven-year prison maximum for criminal use of a communication facility).

The maximum sentencing exposure for all the pending charges was 112 years' imprisonment. Even if we accepted Appellant's invitation to bar dual convictions for conspiracy to possess a controlled substance with intent to deliver and corrupt organizations – conspiracy with others to conduct or participate in a pattern of racketeering activity, as Appellant requests in his third issue on appeal, then the maximum sentencing exposure would still be 97 years if the inchoate charge with the lower sentencing maximum were omitted. In any case, the maximum sentencing exposure was larger than either of the maximum exposure periods that the Commonwealth alluded to during Appellant's waiver of counsel colloquy. *See* N.T. 3/11/21, 16 (reference to a maximum sentencing exposure of 80 years); *id.* at 17 (reference to a similarly situated defendant's sentence with a 90-year maximum). Moreover, we do not discern any discussion concerning fines in

the notes of testimony containing the waiver of counsel colloquy. Because the record fails to show that the trial court elicited sufficient information from Appellant to confirm his understanding of his accurate exposure to sentences and fines, the waiver of counsel colloquy was inadequate on this alternate basis. *See Phillips*, 93 A.3d at 854-55 (vacating judgments of sentence and remanding for trial due to failures to meet the minimum requirements of Pa.R.Crim.P. 121 where, *inter alia*, the court asked standby counsel whether Appellant understood the permissible range of sentences but did not elicit that information from Appellant); *Commonwealth v. Houtz*, 856 A.2d 119, 130 (Pa. Super. 2004) (noting that a waiver of counsel colloquy was flawed where, *inter alia*, the trial court did not ensure that Houtz understood the range of penalties the court could impose); *see also Commonwealth v. Owens*, 750 A.2d 872, 876 (Pa. Super. 2000) (stating, upon consideration of an ineffective assistance of counsel claim concerning a waiver of counsel colloquy under the precursor rule to Pa.R.Crim.P. 121, "we cannot conclude the waiver of trial counsel colloquy was valid where appellant was not informed of the permissible range of sentences for crimes charged").

We are compelled to vacate Appellant's judgment of sentence and remand for a new trial based on the result of our review of the first issue. *See Houtz*, 856 A.2d at 130-131 (addressing the grant of relief arising from a flawed waiver of counsel colloquy). This grant of relief limits the scope of our review for the remaining issues presented. We have no need to address Appellant's challenge to the weight of the evidence as a hypothetical grant of

relief on that claim would produce the same result we have already reached as to the first issue. On the same basis, there is no need to address Appellant's challenge to the discretionary aspects of his sentence because that sentence is necessarily vacated. If not for the fact that the Commonwealth declined to file a brief, we would have addressed Appellant's third issue arguing for the application of 18 Pa.C.S. § 906 ("A person may not be convicted of more than one of the inchoate crimes of criminal attempt, criminal solicitation or criminal conspiracy for conduct designed to commit or to culminate in the commission of the same crime.") because that issue would necessarily arise again with a new trial on the existing charges.[8] We would prefer not to address that issue without adequate briefing at this stage and would direct the trial court to address it, following new briefing, on remand.[9]

---

[8] The Commonwealth also declined to file any responsive brief after Appellant raised this issue in his supplemental post-sentence motions. Supplemental Post-Sentence Motions, 8/27/21, 7.

[9] In **Commonwealth v. Besch**, 614 A.2d 1155 (Pa. Super. 1992), **reversed on other grounds**, 674 A.2d 655 (Pa. 1996), this Court held that the imposition of separate sentences for conspiracy to violate the Corrupt Organizations Act and conspiracy to commit the underlying criminal activity, there possession of controlled substances with intent to deliver, did not constitute a double jeopardy violation. **Besch**, 614 A.2d at 1158-59. This Court did not review a claim under Section 906 in **Besch** but rejected a similar claim that the defendant raised pursuant to 18 Pa.C.S. § 903(c) ("If a person conspires to commit a number of crimes, he is guilty of only one conspiracy so long as multiple crimes are the object of the same agreement or continuous conspiratorial relationship."). **Besch**, 614 A.2d at 1159. Appellant's argument for his claim based on Section 906 does not address or distinguish **Besch**, Appellant's Brief at 25-26, and the Commonwealth has not offered us any briefing for this issue even though it relied on a "Commonwealth v. Besh" *(Footnote Continued Next Page)*

Our review at this time must necessarily include Appellant's second and sixth claims on appeal, addressing a denial of a constitutional speedy trial rights claim and a challenge to the sufficiency of the evidence because hypothetical grants of relief on either claim could preclude the need to remand for a new trial.

In his second issue, Appellant claims that his constitutional right to a speedy trial were violated by the delays in his case from March 16, 2020, until the start of his trial on March 15, 2021, that were attributed to Huntingdon County's local judicial emergency that was declared due to the Covid-19 pandemic pursuant to our Supreme Court's administrative order at *In re Gen. Statewide Judicial Emergency*, 228 A.3d 1281, 1282 (Pa., Mar. 16, 2020) (table). Appellant's Brief at 20-25; *see also In Re: 20th Judicial District*, Declaration of Judicial Emergency and Multiple Extensions, No. 33-MM-2020 (Huntingdon C.P., Zanic, J., 3/6/20, 4/20/20, 5/28/20, 9/1/20, 12/30/20, and 3/31/21).[10] Appellant asserts: "The reason for the delay, the pandemic,

_____

in its arguments against Appellant's related claim in the supplemental post-sentence motions. *See* N.T. 9/23/20, 20-21. In the absence of briefing from both parties that addresses our decision in *Besch*, we will decline to address this issue at this time.

[10] Beginning in March of 2020, the Supreme Court of Pennsylvania issued emergency orders suspending Pa.R.Crim.P. 600 statewide through June 1, 2020. *See in re Gen. Statewide Judicial Emergency*, 228 A.3d 1283, 1287 (Pa., filed Mar. 18, 2020) (table); *In re Gen. Statewide Judicial Emergency*, 230 A.3d 1015, 1019 (Pa., filed Apr. 28, 2020) (table). While the statewide judicial emergency ended, the court expressly empowered each judicial district's president judge to enter self-effectuating declarations of
*(Footnote Continued Next Page)*

- 21 -

is admittedly something beyond the control of the Commonwealth, and the court system. However, more importantly, it is beyond the control of the Defendant as well, and should not be used against him to his prejudice." Appellant's Brief at 24.

Appellant claims that the pandemic-associated delay prejudiced him by causing him increased anxiety and impairing his ability to prepare and present his defense:

> The Defendant's ongoing incarceration, and the anxiety and concern accompanying the same, is its own form of prejudice. However, prejudice was also suffered due to the conditions of the confinement, which led to a deprivation of resources necessary for trial preparation. The Defendant was prejudiced in terms of the fading memories of the witnesses (whose memories have already been admitted by the Commonwealth to be impaired). This prejudice did not take place simply in the general sense, but also impaired the Defendant's defense in his effort to cross-examine Commonwealth witnesses about various specific details in order to establish his defense relating to various inconsistencies in the witnesses' accounts over time.

Appellant's Brief at 25. This claim is specifically raised on constitutional grounds rather than under Pa.R.Crim.P. 600 because that rule was suspended for the time period at issue based on the local judicial emergency declaration. *See* Supplemental Post-Sentence Motions, 8/27/21, 2-6.

---

judicial emergency, which could "[s]uspend statewide rules pertaining to the rule-based right of criminal defendants to a prompt trial." ***In re Gen. Statewide Judicial Emergency***, 234 A.3d 408 (Pa., filed May 27, 2020) (table); *see* Pa.R.J.A. 1952(B)(2)(m).

In its opinion, the trial court evaluates Appellant's claim based on the following four-factors addressed in the United States Supreme Court's decision in **Barker v. Wingo**, 407 U.S. 514 (1972): (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. Trial Court Opinion, 2/28/22, 56-58, **citing, among other things, Commonwealth v. Bradford**, 46 A.3d 693, 700-701 (Pa. 2012) (addressing the factors in **Barker**'s balancing test). The trial court found that the first two factors weighed "heavily in favor of the Commonwealth, and against" Appellant, and that the third factor was "relatively neutral." Trial Court Opinion, 2/28/22, 57. The court noted that it was self-evident that the effects of the pandemic were unprecedented and that Appellant timely raised his Rule 600/speedy trial motions. **Id.** As for the possibility of prejudice, the court reasoned that the Commonwealth faced more potential harm from the delay than Appellant:

> Here, the period of delay was only 168 days, the Commonwealth's case was based on an investigation that was documented in real time, and any infirmities in the memories of the witnesses served to aide Defendant and harm the Commonwealth, as they reduced the credibility of such witnesses and the weight that could be accorded to their testimony. This factor therefore weights in favor of the Commonwealth, and against the Defendant.

Trial Court Opinion, 2/28/22, 58. Because it concluded that none of the **Barker** factors supported Appellant's claim, it denied the claim as meritless. **Id.**

We review a court's determination of a speedy trial violation for an abuse of discretion. ***Commonwealth v. Martz***, 232 A.3d 801, 812 (Pa. Super. 2020). "[O]ur scope of review is limited to the trial court's findings and the evidence on the record, viewed in the light most favorable to the prevailing party." ***Id., quoting Commonwealth v. Miskovitch***, 64 A.3d 672, 677 (Pa. Super. 2013) (citation and quotation marks omitted).

"The Sixth Amendment guarantees state criminal defendants the right to a speedy trial by operation of the Fourteenth Amendment's Due Process Clause. Further, Article I, Section 9 of the Pennsylvania Constitution protects a criminal defendant's right to a speedy trial co-extensively with the Sixth Amendment to the United States." ***Commonwealth v. DeBlase***, 665 A.2d 427, 432 n.2 (Pa. 1995) (citations omitted). Our Courts have continued to apply the above-referenced four-factor balancing test in ***Barker*** where an appellant presents independent claims premised on both the Commonwealth's procedural speedy trial right rule at Pa.R.Crim.P. 600 and the constitutional guarantees. ***Martz***, 232 A.3d at 812.

Appellant in his instant claim does not address the trial court's application of the ***Barker*** factors to his claim. In the absence of any specific criticism of the trial court's review, we do not find anything objectionable about the trial court's analysis. To the extent that Appellant's argument is singularly focused on an assertion that the pandemic-associated delay caused him prejudice, we find that his argument is baldly asserted and contradicted by the record.

For the entire period of the delay at issue, there was no apparent issue concerning whether the pandemic hampered Appellant's ability to prepare for trial; he was represented by counsel for that entire period until he chose to proceed *pro se* on the day the jury was selected for his trial. While he now alleges that continued incarceration and anxiety arising from the judicial emergency affected him and hampered his ability to prepare for trial his assertions during his waiver of counsel colloquy belie his present assertions about prejudice.

The record does not support the allegation that Appellant was deprived of resources for trial preparation due to the delay arising from the pandemic-related judicial emergency. His attorney confirmed that Appellant had access to all the discovery in the case other than grand jury transcripts. N.T. 3/11/21, 4. His attorney informed the court that he took a box of discovery to Appellant "before the virus" and continued to forward things from the Commonwealth to Appellant "each time [the prosecutor] sent [him] something." *Id.* at 4-5. Appellant acknowledged that he had reviewed the discovery "as much as what [he] had." *Id.* at 4. As for the grand jury transcripts, the prosecutor informed the trial court that he procured a disclosure order that would grant Appellant access to the transcripts and the trial court designated that Appellant would have access to them in his prison law library during the weekend before his trial and at the courthouse during the course of his trial. *Id.* at 8-9, 20-21, 66-67. The record indicates that the pandemic delay did not limit Appellant's access to the discovery in the

case and only Appellant's delay in seeking to proceed *pro se* delayed his access to grand jury transcripts that otherwise would have remained in the possession of his counsel.

To the extent that Appellant cited anxiety and potential fading memories for witnesses as additional reasons for prejudice, he does not demonstrate how those factors were evident from the record or had an effect on the outcome of his trial. He did not discuss any bout of anxiety in the course of his waiver of counsel colloquy and he fails to identify any witnesses with any hypothetical memory issues resulting from the pandemic-associated delay. Upon our thorough review of the trial transcripts and the certified record, we are unable to find support for Appellant's allegations of prejudice. Accordingly, we decline to find any basis to grant relief on Appellant's constitutional speedy trial rights claim.

In his sixth issue, Appellant challenges the sufficiency of the evidence asserting that the Commonwealth did not prove his possession of a controlled substance for purposes of his PWID conviction, and by extension his convictions for conspiracy and dealing with proceeds of unlawful activities, and his corrupt organizations convictions. Brief for Appellant at 34-38. He also asserts that there was insufficient proof of a pattern of racketeering for purposes of his corrupt organizations convictions.[11] *Id.*

Our standard of review for a sufficiency claim is as follows:

---

[11] We note that Appellant does not address his conviction for criminal use of a communication facility in this claim.

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above test], we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Chisebwe*, 278 A.3d 354, 358 (Pa. Super. 2022) (citation omitted).

The offense of PWID is defined by statute as follows:

(a)  The following acts and the causing thereof within the Commonwealth are hereby prohibited:

\*\*\*

(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance not registered under this act, or a practitioner not registered or licensed by the appropriate State board, or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

35 P.S. § 780-113(a)(30). To establish the offense of PWID, the Commonwealth must prove beyond a reasonable doubt that the defendant possessed a controlled substance with intent to deliver. **Commonwealth v. Jones**, 874 A.2d 108, 121 (Pa. Super. 2005). "[A]ll of the facts and circumstances surrounding the possession are relevant and the elements of the crime may be established by circumstantial evidence." **Commonwealth v. Little**, 879 A.2d 293, 297 (Pa. Super. 2005).

The possessory element for PWID can be proven either through evidence of actual or constructive possession. **See Commonwealth v. Parrish**, 191 A.3d 31, 36 (Pa. Super. 2018) (for purposes of a statutory element of possession, this Court has explained that "[p]ossession can be found by proving actual possession, constructive possession, or joint constructive possession") (citation omitted). "We have defined constructive possession as conscious dominion." **Commonwealth v. Hopkins**, 67 A.3d 817, 820 (Pa. Super. 2013) (citation and quotation omitted). "We subsequently defined conscious dominion as the power to control the contraband and the intent to exercise that control." **Id.** (citation and quotation omitted). "To aid application, we have held that constructive possession may be established by the totality of the circumstances." **Id.** (citation and quotation omitted).

To sustain a conviction for criminal conspiracy, the Commonwealth must demonstrate beyond a reasonable doubt that the Appellant: (1) entered into an agreement to commit or aid in an unlawful act with another; (2) with a shared criminal intent; and (3) an overt act in furtherance of the conspiracy

- 28 -

was done. ***Commonwealth v. Feliciano***, 67 A.3d 19, 25-26 (Pa. Super. 2013) (*en banc*). The conduct of the parties and the totality of circumstances may create a web of evidence linking a defendant to the alleged conspiracy beyond a reasonable doubt. ***Id.*** The conspiratorial agreement can be inferred from a variety of circumstances, including the relationship between the parties, knowledge of the crime, participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode. ***Id.***

Appellant was convicted of dealing in proceeds of unlawful activities under 18 Pa.C.S. § 5111(a)(1), which provides in relevant part:

> (a) A person commits a felony of the first degree if the person conducts a financial transaction under any of the following circumstances:
>
> > (1) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity, the person acts with the intent to promote the carrying on of the unlawful activity.

18 Pa.C.S. § 5111(a)(1). Section 5111(f) defines "financial transaction" as "a transaction involving the movement of funds by wire or other means or involving one or more monetary instruments. The term includes any exchange of stolen or illegally obtained property for financial compensation or personal gain." ***Id.*** The same subsection defines "unlawful activity" as "any activity graded a misdemeanor of the first degree or higher under Federal or State law." ***Id.*** "Section 5111 thus presents explicit language which clearly defines

unlawful activity as any felony or first degree misdemeanor, and targets the dealing in proceeds derived from any of those various illegal activities." ***Commonwealth v. Hill***, 210 A.3d 1104, 1113 (Pa. Super. 2019) (citation omitted).

The crime of corrupt organizations is contained in 18 Pa.C.S. § 911(b). Appellant was convicted under section 911(b)(3), which states, "It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." He was also convicted of a separate offense under 911(b)(4) for conspiring to violate the corrupt organizations statute. A "pattern of racketeering activity" is defined as "a course of conduct requiring two or more racketeering activity one of which occurred after the effective date" of the corrupt organizations statute. 18 Pa.C.S. § 911(h)(4). The definition for a "racketeering activity" includes, *inter alia*, offenses indictable under 35 P.S. § 780-113, relating to the sale and dispensing of narcotic drugs, 18 Pa.C.S. § 5111, relating to dealing in proceeds of unlawful activities, and a conspiracy to commit any of the offenses included in the definition for a "racketeering activity." 18 Pa.C.S. § 911(h)(i)-(iii).

Appellant disputes that the evidence proved his possession of a controlled substance for his PWID conviction. He acknowledges that the evidence "included a single incident of the recovery of actual controlled substances alleged to have been possessed or constructively possessed by" him. Appellant's Brief at 36. He appears to be referring to the controlled drug

sale that occurred in April 2017. He implies that the Commonwealth only presented a theory for constructive possession "because no one documented or testified that [he] actually had physical possession of the controlled substance." *Id.* This argument fails under the standard of review because it presumes that his possession of a controlled substance could only be proven by direct evidence whereas the Commonwealth was fully able to prove that element through circumstantial evidence.

The evidence addressing the controlled drug sale established the possessory element for the PWID conviction. Trooper Corl testified that a confidential informant arranged to buy a hundred dollars' worth of crack cocaine for a controlled drug sale that was observed on April 11, 2017. N.T. 3/15/21, 46, 48-55. The informant was searched by police prior to the planned sale, with no contraband or money discovered on her person. *Id.* at 54-55. Trooper Corl dropped off the informant at the arranged location and he was able to see a side profile of Appellant there. *Id.* at 55-56. The informant entered Appellant's blue Ford Explorer that was determined registered in the name of his wife's mother. *Id.* at 46-47, 49, 57; *see also id.* at 59 (Trooper Corl confirmed his identification at trial based on the "result of the whole investigation). Appellant and the informant then circled around a trailer park while another trooper conducted surveillance of them. *Id.* at 57. After coming to a stop at the initial location of the car, Appellant's wife, Shantel, entered the car. *Id.* at 58, 63. The informant then exited Appellant's car, returned to Trooper Corl's vehicle, and provided him a bundle of glassine

bags containing suspected heroin (which turned out to be fentanyl) and twenty dollars of change.[12]  *Id.* at 63-65.  No additional drugs or contraband were recovered from her.  *Id.* at 71.  Trooper Corl confirmed at trial that the informant told him that Appellant's wife brought the bundle of suspected heroin to the car and gave Appellant the bundle, and that he had provided the bundle to the informant.  *Id.* at 65.

Trooper Corl's testimony about the controlled drug sale was corroborated by the testimony of the other trooper that assisted with surveillance of Appellant's car, and the informant.  N.T. 3/15/21, 74-78, 80-97.  Trooper Peterson, the other surveillance officer, made clear that no one else had entered Appellant's car as it circled the trailer park to the original spot where the informant had entered it.  *Id.* at 77-78.  The informant confirmed the troopers' accounts of the controlled drug sale, including that Appellant was the person in the car with her who had handed her the purchased bundle that was brought to the car by Appellant's wife.  *Id.* at 81, 86-95.

Appellant's possession of controlled substances was also sustained by other testimony about sales.  The informant for the controlled drug sale confirmed that she purchased crack cocaine from Appellant on five to six prior

---

[12] The trooper explained that an initially ordered "bone" of crack cocaine became a "bun," short for a bundle of heroin bags because of a miscommunication of the terms "bone" and "bun."  N.T. 3/15/21, 64-65. Chemical testing of the bundle revealed that it contained fentanyl, a Schedule II controlled substance.  *Id.* at 66; *see also id.* at 94 (the informant explaining the same miscommunication).

occasions. N.T. 3/15/21, 86-87. Ashley Shade testified about sales Appellant and his wife made to her and her boyfriend Shane which they used for reselling and their own personal consumption. *Id.* at 124-30, 132, 134-35, 159-60, 169. Within her testimony were assertions that Appellant personally completed sales of heroin to her. *Id.* at 160 (in reference to her drug purchases with Appellant who she referred to as "Mack": "THE COURT: Did he ever give you the heroin? THE WITNESS: Yeah."). Monisha Hunter testified to purchasing crack cocaine from Appellant and his wife on at least two occasions and that Appellant handed the drugs to her in the first transaction. *Id.* at 222-27. Additionally, Richard Hollibaugh testified to repeatedly buying bundles of heroin from Appellant, Miranda Crouse testified that she had also been buying heroin from Appellant and his wife, and Kevin Banks testified to buying crack cocaine from Appellant and his wife. N.T. 3/16/21, 5-6, 10-11, 77-78, 103-04, 109-111.

The bills of information reflect that that Appellant was charged with possession of a controlled substance with intent to deliver a controlled substance "on or between March 2017 and September 2017." Bills of Information 6/6/19, 1. Appellant's PWID charge also addressed an array of various drugs: "cocaine, crack cocaine, and fentanyl, Schedule II controlled substances, and a heroin, a Schedule I controlled substance." *Id.* The fact-finder was thus able to infer Appellant's possession of a controlled substance from testimony involving both the controlled drug sale conducted on April 11, 2017, in addition to the testimony about other sales made by Appellant to the

various witnesses during the seven-month span addressed in the time period set forth in bills of information.[13]  Here, Appellant's possession of controlled substances for purposes of his PWID conviction was proven by the testimony of the purchasers from the various drug sales addressed in the testimony, including the informant from the controlled drug sale surveilled by the police, in addition to other buyers such as Ashley Shade and Monisha Hunter.  N.T. 3/15/21, 81, 86-95, 160, 222-27.

Contrary to Appellant's claim, the testimony of the witnesses as to his personal handling of drugs was direct evidence of possession once the witness' accounts were accepted as true by the jury sitting as the fact-finder.  **See** **Black's Law Dictionary**, 596 (8th ed. 2004) (defining "direct evidence" as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.").

In the alternative, Appellant's possession of controlled substances was also able to be sustained under theories of constructive possession and conspiratorial liability in the instances of sales where his co-conspirator wife handled the controlled substances.  In the instances where Appellant and his wife together sold drugs for their shared enterprise, the possession of the controlled substances by his conspirator wife could be imputed to Appellant for sufficiency purposes.  **See Commonwealth v. Bowens**, 265 A.3d 730, 741 (Pa. Super. 2021) (*en banc*) ("Another basis for imputing possession by

---

[13] The Commonwealth also amended the end date for the offenses at trial to January 24, 2018.  **See** N.T. 3/11/21, 14-15, 23.

a defendant in the absence of direct evidence of actual possession is conspiracy liability. It is hornbook law that a member of a conspiracy is criminally culpable for all actions taken in furtherance of the conspiracy."); ***Commonwealth v. Hatch***, 611 A.2d 291, 293 (Pa. Super. 1992) (evidence sufficient for constructive possession for purposes of PWID where Hatch was handed $140 by an undercover police officer for hashish and then several hours later, when Hatch and a co-conspirator met with the officer and an informant, the co-conspirator handed the informant the drugs).

In the remainder of his sufficiency claim, Appellant alleges that the evidence was inadequate to support "a pattern of racketeering activity" because of a lack of evidence proving "a second instance of a controlled substances violation." Appellant's Brief at 38. Putting aside the fact that in our discussion above we already concluded that there was ample evidence for numerous drug transactions that supported Appellant's PWID conviction, Appellant's challenge to the sufficiency of the evidence for a "pattern of racketeering activity" is premised on an incorrect reading of the corrupt organizations statute. A "pattern of racketeering activity" could be proven by "two or more acts of racketeering activity." 18 Pa.C.S. § 911(h)(4). That did not necessarily mean that, in order to convict Appellant of violating 18 Pa.C.S. § 911(b)(3), the Commonwealth needed to convict Appellant of multiple counts of PWID. The corrupt organizations statute's definition for "racketeering activity" includes, in addition to offenses under the Controlled Substance, Drug, Device and Cosmetic Act, offenses relating to dealing in

proceeds of unlawful activities and conspiracies to commit other offenses identified as racketeering activities. *See* 18 Pa.C.S. § 911(h)(1)(i)-(iii). Because Appellant was convicted of three offenses that constituted racketeering activities (possession of a controlled substance with intent to deliver, conspiracy to commit possession of a controlled substance with intent to deliver, and dealing in proceeds of unlawful activities), and he presents no meritorious theory for insufficient evidence sustaining those convictions, the evidence was necessarily sufficient to support "a pattern of racketeering activity" for purposes of Appellant's conviction under 18 Pa.C.S. § 911(b)(3).

We note in the alternative that multiple PWID offenses that are supported by the evidence could be sufficient to sustain a "pattern of racketeering activity" in the absence of multiple of PWID charges because our corrupt organizations statute does not require that a defendant be convicted of predicate crimes constituting a pattern of racketeering activity. *See Commonwealth v. Taraschi*, 475 A.2d 744, 749 (Pa. Super. 1984) ("The [corrupt organizations] Act, however, has no requirement that a defendant be convicted of the predicate crimes constituting the pattern of racketeering."). In either case, Appellant's sufficiency claim does not merit an arrest of judgment.

Based on our review of Appellant's first issue, we vacate the judgments of sentence and remand for a new trial. We also direct the trial court to address Appellant's third issue concerning the application of 18 Pa.C.S. § 906,

following an opportunity for both parties to submit briefs on the issue.
Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/26/2023